UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| MAURICE CLARK, | ) | CASE NO.5:14-cv-2712 |
| | ) | |
| PLAINTIFF, | ) | JUDGE SARA LIOI |
| | ) | |
| vs. | ) | |
| | ) | **MEMORANDUM OPINION** |
| OHIO DEPARTMENT OF YOUTH SERVICES, et al., | ) ) | |
| | ) | |
| DEFENDANTS. | ) | |

Before the Court is the motion for summary judgment filed by defendants Benny Wilmoth ("Wilmoth") and Garland Rivers ("Rivers") (collectively "defendants").[1] (Doc. No. 36 ["MSJ"].) Plaintiff Maurice Clark ("Clark" or "plaintiff") filed a brief in opposition (Doc. No. 39 ["Opp'n"]) and defendants filed a reply (Doc. No. 41 ["Reply"]). For the reasons set forth herein, defendants' motion is granted.

## I. BACKGROUND

The sole remaining claim in this lawsuit is a claim of excessive force brought pursuant to 42 U.S.C. § 1983.[2] Clark alleges that, on January 10, 2013, while he was a 20-year old residing

---

[1] Defendant Ohio Department of Youth Services was dismissed on July 2, 2015. (Doc. No. 17.)

[2] The claim asserts a violation under the Fourth, Eighth and Fourteenth Amendments. But the Court need only consider the Eighth Amendment claim of excessive force since Clark was not a pretrial detainee at the time of the events in question. "In addressing an excessive force claim brought under § 1983, analysis begins by identifying the specific constitutional right allegedly infringed by the challenged application of force." *Graham v. Connor*, 490 U.S. 386, 394, 109 S. Ct. 1865, 104 L. Ed. 2d 443 (1989) (citation omitted). "[A]ll post-conviction excessive force claims are to be raised 'exclusively under the Eighth Amendment's cruel and unusual punishment clause.'" *Pelfrey v. Chambers*, 43 F.3d 1034, 1036-37 (6th Cir. 1995) (quoting *Cornwell v. Dahlberg*, 963 F.2d 912, 915 (6th Cir. 1992)); *see also Hudson v. McMillian*, 503 U.S. 1, 5-6, 112 S. Ct. 995, 117 L. Ed. 2d 156 (1992) ("the unnecessary and wanton infliction of pain … constitutes cruel and unusual punishment forbidden by the Eighth Amendment[ ]") (internal quotation marks and citations omitted). The parties themselves argue only under the Eighth Amendment.

at a facility in Massillon, Ohio operated by the Ohio Department of Youth Services ("ODYS"),[3] he was subjected to excessive force by Wilmoth and Rivers, who were both Youth Specialists ("YS") at ODYS. The incident began with a verbal altercation in the cafeteria and ended with a physical altercation in the day room of the facility, where Clark suffered a broken arm and some abrasions, after being taken down by Rivers[4] and restrained by Rivers, Wilmoth, and others.

There is no dispute that these are the facts. The question on summary judgment is primarily a legal one, namely, whether the force used under the circumstances was "excessive" within the meaning of Eighth Amendment jurisprudence.

## II. DISCUSSION

**A.  Summary Judgment Standard**

Under Fed. R. Civ. P. 56(a), when a motion for summary judgment is properly made and supported, it shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

An opposing party may not rely merely on allegations or denials in its own pleading; rather, by affidavits or by materials in the record, the opposing party must set out specific facts showing a genuine issue for trial. Fed. R. Civ. P. 56(c)(1). Affidavits or declarations filed in support of or in opposition to a motion for summary judgment "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or

---

[3] At the age of 17, Clark was charged with violent crimes and was certified to stand trial as an adult. He entered a plea to felonious assault, and was sentenced to seven years in prison. The case was, however, remanded to juvenile court and Clark was committed to ODYS. (Clark Dep. [Doc. No. 33] at 176-77; *see also* MSJ at 360, n. 1.) Clark's name is being used herein because he is no longer a minor.

[4] There is some dispute as to whether the "take down" was in the form of a "tackle" (plaintiff's view) or a "balance displacement technique" (defendants' view), but this appears to be little more than semantics. At his deposition, Clark testified that Rivers grabbed neither his legs nor his lower body, but that he "hit me like a football player[ ]" in the upper part of his body. (Clark Dep. at 287.) This is borne out by the video footage. (*See* Day 1A at Frame 677 (06:33:17).)

declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). A movant is not required to file affidavits or other similar materials negating a claim on which its opponent bears the burden of proof, so long as the movant relies upon the absence of the essential element in the pleadings, depositions, answers to interrogatories, and admissions on file. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).

In reviewing summary judgment motions, this Court must view the evidence in a light most favorable to the non-moving party to determine whether a genuine issue of material fact exists. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S. Ct. 1598, 26 L. Ed. 2d 142 (1970); *White v. Turfway Park Racing Ass'n.*, 909 F.2d 941, 943-44 (6th Cir. 1990), *impliedly overruled on other grounds by Salve Regina College v. Russell*, 499 U.S. 225, 111 S. Ct. 1217, 113 L. Ed. 2d 190 (1991). A fact is "material" only if its resolution will affect the outcome of the lawsuit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). Determination of whether a factual issue is "genuine" requires consideration of the applicable evidentiary standards. Thus, in most civil cases the Court must decide "whether reasonable jurors could find by a preponderance of the evidence that the [non-moving party] is entitled to a verdict[.]" *Id*. at 252.

Summary judgment is appropriate whenever the non-moving party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial. *Celotex*, 477 U.S. at 322. Moreover, "[t]he trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479-80 (6th Cir. 1989) (citing *Frito-Lay, Inc. v. Willoughby*, 863 F.2d 1029, 1034 (D.C. Cir. 1988)). The non-moving party is under an affirmative duty to point out specific facts in the record as it has been

established that create a genuine issue of material fact. *Fulson v. City of Columbus*, 801 F. Supp. 1, 4 (S.D. Ohio 1992). The non-movant must show more than a scintilla of evidence to overcome summary judgment; it is not enough for the non-moving party to show that there is some metaphysical doubt as to material facts. *Id*.

**B.     The Law Relating to Use of Force in the Eighth Amendment Context**

"When convicted prisoners bring claims of excessive force, [the Court] turn[s] to the Eighth Amendment, which forbids the 'unnecessary and wanton infliction of pain" that constitutes 'cruel and unusual punishment,' and specifically conduct that is malicious and sadistic." *Coley v. Lucas Cnty., OH*, 799 F.3d 530, 537 (6th Cir. 2015) (quoting *Hudson v. McMillian*, 503 U.S. 1, 5, 7, 112 S. Ct. 995, 117 L. Ed. 2d 156 (1992) (further citations omitted).)

"What is necessary to establish an 'unnecessary and wanton infliction of pain,' … varies according to the nature of the alleged constitutional violation." *Hudson*, 503 U.S. at 5 (quoting *Whitley v. Albers*, 475 U.S. 312, 320, 106 S. Ct. 1078, 89 L. Ed. 2d 251 (1986)). "Where a prison security measure is undertaken to resolve a disturbance, … the question whether the measure taken inflicted unnecessary and wanton pain and suffering ultimately turns on whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." *Whitley*, 475 U.S. at 320-21 (quotation marks and citation omitted). "[Not] every malevolent touch by a prison guard gives rise to a federal cause of action." *Richardson v. Rupert*, No. 3:14-cv-01415, 2015 WL 1456553, at *4 (N.D. Ohio Mar. 30, 2015) (citing *Hudson*, 503 U.S. at 9; *Johnson v. Glick*, 481 F.2d 1028, 1033 (2d Cir. 1973) ("Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights.")).

An Eighth Amendment claim requires a prisoner to satisfy both a subjective component, which focuses on the state of mind of the prison official, and an objective component, which is contextual, requiring the pain that is inflicted to be sufficiently serious. *See Williams v. Curtin*, 631 F.3d 380, 383 (6th Cir. 2011) (citation omitted). "The extent of a prisoner's injury may suggest whether the use of force could plausibly have been thought necessary in a particular situation and may also provide some indication of the amount of force applied." *Tuttle v. Carroll Cnty. Det. Ctr.*, 500 F. App'x 480, 481 (6th Cir. 2012) (per curiam) (citing *Wilkins v. Gaddy*, 559 U.S. 34, 37, 130 S. Ct. 1175, 175 L. Ed. 2d 995 (2010)).

**C.  Application of the Law to the Undisputed Facts**

Most of the factual scenario is established through Clark's own deposition testimony (Doc. No. 33 ["Clark Dep."]), much of which is corroborated by the unchallenged security camera and video footage made available by defendants.[5] Defendants have also submitted the ODYS' Report of Investigation (Doc. No. 36-2 ["Report"]),[6] the unrefuted expert opinion of Samuel D. Faulkner, Chief Executive Officer of Response to Resistance[7] (Doc. No. 36-3

---

[5] The footage is presented on a DVD (Doc. No. 35) that contains a file folder and a movie clip. The file folder (M.Clark #0034 (1-10-13) IV) contains several media files of security footage taken at the youth facility on January 10, 2013. Relevant footage was taken between 6:40 AM and 6:50 AM and includes "Day 1A" (Camera 13), "Day 2A" (Camera 14), and "Day 3A" (Camera 15), showing the incident from three simultaneous vantage points, but with no accompanying audio. The footage runs at about 4 frames per second. The movie clip is video footage, with audio, taken by YS Starlet Arrington with a hand-held camera. (*See* Report at 454.) It documents the handcuffing of Clark and approximately 12 minutes immediately following. The authenticity of all of this footage, as well as the fact that it was created in the ordinary course of business, is confirmed by way of the affidavit of Monica Ellis, Chief Inspector for ODYS. (*See* Doc. No. 36-2.) Plaintiff offers no challenge to any of the footage and, in fact, declares that "[t]he video itself … is the best evidence for this Court." (Opp'n at 696.)

[6] The information contained in this Report is all unsworn and, therefore, has limited usefulness on summary judgment. Under *Tranter v. Orick*, 460 F. App'x 513, 515 (6th Cir. 2012), to be admissible as competent evidence under Fed. R. Evid. 803(8), the report would need to be more than a compilation of witness statements; it must contain actual "factual findings from a legally authorized investigation." The Court notes, however, that plaintiff himself improperly relies upon information in this Report throughout his brief in opposition to the motion. That said, the Court has not relied upon the Report, except to the extent that it might be supported by the video footage.

[7] According to the Response to Resistance website, its mission "is to support the public safety community and keep citizens safe by establishing a national guideline for responses to resistance, assault and aggression." https://responsetoresistance.com (last visited 10/24/16).

["Expert"]), and the unrefuted declaration of John Bradley, M.D., the ODYS Medical Director at the time of the incident (Doc. No. 36-4 ["Bradley Decl."]).

Clark testified that, on January 10, 2013, the events began at breakfast in the facility's cafeteria. Clark claims that Rivers passed him up while collecting forks, also referred to as "sporks." Clark felt Rivers "skipped [him] on purpose" and, as a result, Clark "got salty." (Clark Dep. at 211-14.) Clark tried to add his fork to a friend's tray and Wilmoth observed this, accusing the youths of playing "hide the fork game." (*Id.* at 215.) Clark insisted that he did not play that game, largely because he was "20 years old." (*Id.*) Clark admitted that it made him "mad" when Wilmoth accused him, and that they continued to argue. (*Id.* at 216.) Clark claimed that Wilmoth also threatened to "tear up"[8] Clark's room when they got back to the unit. (*Id.* at 217.) This made Clark even more angry at Wilmoth. (*Id.* at 218.) In fact, he admitted that he remained angry at both Rivers and Wilmoth for "about a month." (*Id.* at 220.)

After breakfast, the youths returned to the day room in their unit where they were allowed turns going to the restroom. (*Id.* at 223.) Clark testified that he continued to argue with the officers because they were allegedly threatening to tear up his room. (*Id.* at 225-26.) Clark claims he got conflicting orders from two officers, one (apparently Wilmoth) telling him to go to the day room, and the other (Michael Franklin, whom he refers to as "Frank") telling him to return to his cell. This made him "mad" and Wilmoth threatened to use a signal (a code) for other officers to come and give assistance.[9] Clark told him to "go ahead and press the code." (*Id.* at 228.)[10]

---

[8] Clark was unclear about what he meant by "tear up" a room. At one point Clark defines "tearing up" a room as searching it (Clark Dep. at 217), and at another time he says it means trashing it (*id.* at 218). Clark said that, while he had "torn up" his own room upon learning that his grandmother had died (*id.*), he had never seen Wilmoth tear up anybody's room (*id.* at 226).

[9] Although, for the sake of thoroughness, the Court has recounted Clark's testimony regarding the lead-up to the particular incident in the day room that underlies the claim of excessive force, even if all of what Clark claims is taken as true, that is, even if it is true that the guards were threatening to "tear up" his room (whatever that might

6

Clark admitted that, after the code was pressed, he was "heated" and "punched the door" twice with his fists. (*Id.* at 231.) Clark further admitted that Franklin tried to calm him down by talking to him,[11] and, because Franklin had a good relationship with Clark, he was succeeding in calming down Clark (*id.* at 232), until Clark saw Rivers and Wilmoth "coming in blocking [him.]" At that point, Clark "squared up with Rivers[,]" "ball[ing] up [his] fists[,]" and "rip[ping] off [his] shirt[.]" (*Id.* at 232, 233.) Clark claimed that he takes off his shirt so nobody can grab his shirt when he fights and when he is angry. (*Id.* at 223, 235.)[12]

After Clark "squared up with Rivers" and saw Rivers and Wilmoth closing in, he "jumped over the couches, went over [ ] by the drinking fountain and waited for the OM[13] to come in, because the code was already called." (*Id.* at 235, footnote added.) He claimed he wanted "to get away … from [Wilmoth] and Rivers[,]" believing they were "going to hurt [him] in the restraint." (*Id.* at 236, 237.) He claimed he "was over by the drinking fountain standing there" when he "heard the door come open[,]" and saw "a whole bunch of shields." (*Id.* at 238.)

---

mean) to find the allegedly missing spork, and even if he was getting conflicting orders from them, none of that is relevant to the question of whether he was subjected to excessive force. Those verbal situations, in themselves, could not even arguably be equated to excessive force. *See, e.g., Ivey v. Wilson*, 832 F.2d 950, 955 (6th Cir. 1987) (plaintiff's allegations of "verbal abuse," "harassment," or "arbitrariness" insufficient for a § 1983 claim); *Rutherford v. Warden, SOCF*, No. 1:15-cv-164, 2015 WL 1346769, at *5 (S.D. Ohio Mar. 23, 2015) (plaintiff failed to state a viable § 1983 claim based on allegations of a verbal altercation and harassment during the incident that led up to the guard's alleged use of excessive force) (citing *Ivey* and other cases).

[10] The particular code is called a Signal 5. When that signal is given, all the youths not involved are expected to "hit[] the wall" while any youth involved in the code (in this case, Clark) is expected to stay put and not blend in with the others. (Clark Dep. at 230, 271.) The security footage documents the moment when the signal must have been given, showing youths jumping up from their seats on the couches in the day room and moving quickly toward the wall, facing the wall, with their hands raised. (*See, e.g.*, Day 2A at Frames 558-580 (06:32:45 to 06:32:50).) The same footage also shows Clark continuing to pace in long strides around the back of the couch.

[11] "Verbal strategies" are the "preferred response to youth resistance[,]" according to Standard Operating Procedure ("SOP") No. 301.05.01, dealing with "Use of Force." (*See* Doc. No. 36-5 at 674.)

[12] In fact, the security footage shows Clark taking off his shirt immediately upon his return from the hallway restroom, well before Rivers and Wilmoth are "coming in blocking [him]" and well before Clark squares up with Rivers or balls up his fists.

[13] The record does not identify the meaning of "OM." In his opposition brief, plaintiff identifies the "OM" as "a senior administrator at the facility[.]" (Opp'n at 694.)

It is at this point that the parties' accounts diverge. Although in evaluating defendants' motion for summary judgment the Court must view the facts and draw all reasonable inferences in the light most favorable to Clark, "[t]here is, however, an added wrinkle in this case: existence in the record of a videotape capturing the events in question." *Scott v. Harris*, 550 U.S. 372, 378, 127 S. Ct. 1769, 167 L. Ed. 2d 686 (2007). In such circumstances, the Court must also "view[ ] the facts in the light depicted by the videotape." *Id.* at 381; *see also Iko v. Shreve*, 535 F.3d 225, 230 (4th Cir. 2008) ("[W]here, as here, the record contains an unchallenged videotape capturing the events in question, we must only credit the plaintiff's version of the facts to the extent it is not contradicted by the videotape.").

As confirmed by the security footage (and outlined in detail below), Clark's deposition testimony about the occurrence in the day room is accurate up to the point where he claims to have jumped over the couches and then *stood by the wall waiting for other officers to arrive*. The footage "blatantly contradicts" that testimony, *Scott*, 550 U.S. at 380, showing that Clark never stopped running toward the direction of a water fountain on the wall, near where YS Crim had just entered the room and in close proximity to a bucket and mop (a potential weapon) remaining from cleaning that had occurred earlier.[14] In fact, in the security footage, it appears as though Clark is running toward Crim, and squaring up to aggressively approach Crim, as Crim enters the room. Within a mere couple of seconds, and when he nearly reaches Crim, Rivers grabs Clark from behind and brings him down, causing both of them to crash into the nearby wall.[15]

---

[14] YS Crim, who was entering the day room in response to the Signal 5, also stated in the Report that he saw Clark jump over the couches and run toward him with fists raised. He wondered how he would protect himself, given that Clark was heading toward the mop and bucket. (Report at 457.)

[15] Although Clark argues he was posing no threat at all, evidenced by the fact that no other YS besides Rivers was moving to restrain or stop him, in fact the procedures were consistent with SOP 301.05.01, which permits a physical response to a "resistant youth," including, *inter alia*, a youth that is verbally threatening, threatening with movement, or physically resisting. (Doc. No. 36-5 at 677.) Physical responses are warranted under the SOP when a

8

The Day 1A, Day 2A, and Day 3A security footages confirm[16] the following sequence of events:

- Frames 88-90 (06:30:39 to 06:30:40) – A guard[17] stands behind the desk in an empty day room; a large, yellow, wheeled bucket, with a mop sticking out, stands near the wall, in front of a chair; two brooms are on the floor next to the bucket; two long couches are evident, facing away from the wall where the bucket is located, and facing toward a television; opposite the guard desk is a hallway

- Frame 91 (06:30:41) – Youths begin to enter the room in a line

- Frames 140-144 (06:30:54 to 06:30:55) – Clark enters the day room, arms at his side; other youths are ahead of him; a guard remains at the desk

- Frames 146-153 (06:30:55 to 06:30:57) – Clark walks toward the yellow bucket, looking to the right

- Frames 168-188 (06:31:00 to 06:31:06) – Two more guards are visible, walking into the day room (one leans against the desk, the other [Rivers] walks toward the hallway across the room, glancing toward Clark); Clark moves the yellow bucket, pushing it by using the handle of the mop sticking out of the bucket, and then sits in the chair next to the wall; the other youths sit down on the two couches

- Frames 196-246 (06:31:09 to 06:31:22) – Clark stands up, walks into the hallway, walking close behind Rivers, who remains in the doorway while Clark passes into the hallway

- Frames 510-534 (06:32:32 to 06:32:39) – Clark comes from the hallway back into the day room; other youths remain seated on the couches; there are no guards visible

- Frames 535-553 (06:32:39 to 06:32:44) – While pacing, Clark removes his shirt and throws it on the floor near the water fountain to his left, which is in close proximity to the bucket/mop and brooms; Rivers and another guard come out of the hallway and enter the day room

- Frames 554-559 (06:32:44 to 06:32:45) – Clark paces back across the room toward the hallway

---

youth "is currently physically violent and poses an immediate danger toward self or others" or "is affirmatively physically resisting institutional rules and poses an immediate danger to self or others[.]" (*Id.* at 678.) "When the need for physical response has been identified, the **least amount** of physical response appropriate to the risk posed by [the] youth is required." (*Id.*, emphasis in original.) Certain forms of physical response are prohibited (*see id.* at 679), but none of these forms are evident at any point in the security footage or the video footage.

[16] The views are clearer in some footages than in others, due to the varying camera vantage points. The frame numbers are approximate; the times are closer to accurate.

[17] The guards are unidentified in the footage; however, the Report submitted by defendant contains a few photos wherein Rivers, Wilmoth, Franklin and Crim are identified. (*See* Report at 464.)

- Frames 560-568 (06:32:46 to 06:32:48) – The other youths stand up and hurry toward the wall (at the point when the Signal 5 was apparently made); Clark continues to pace across the room; the two guards move slightly more into the room from the hallway

- Frames 569-592 (06:32:48 to 06:32:54) – Clark, still pacing, eventually passes one couch [Frame 582]; two guards (including Rivers) fully enter the room from the hallway, one walks toward the yellow bucket with the mop in it and picks up the two brooms that are on the floor next to the bucket with the mop [Frames 587-92]

- Frames 593-619 (06:32:54 to 06:33:01) – Clark paces between the couches and around the back, while one guard moves the two brooms to the floor behind the desk, and two other guards (Rivers and Franklin) approach the center of the room keeping their distance from Clark; other youths are visible at the end of the room, faces to the wall

- Frames 620-629 (06:33:02 to 06:33:04) – Clark walks toward the wall near the end of the couch and punches a door,[18] while Franklin approaches him

- Frames 630-638 (06:33:04 to 06:33:07) – Clark turns around, as Franklin and Rivers approach him; Clark walks back toward the couches, Rivers walks around Franklin, and Clark appears to raise his fists in an aggressive stance ("squared up") toward Rivers, who is walking toward Clark but not in an aggressive stance [Frame 638]

- Frames 639-664 (06:33:07 to 06:33:13) – Clark, facing Franklin and Rivers, backs away, both fists clenched [Frame 644] and feet planted wide [Frame 646]; Franklin reaches out, almost touching Clark on the chest, holding him back; Clark backs farther away, and steps up on the seat of the first couch [Frame 661] and then onto its back [Frame 664]

- Frames 667-672 (06:33:14 to 06:33:15) – Clark leaps from the back of the first couch to the seat of the other couch, and jumps over the back of that couch to the floor, while guards still keep a little distance

- Frames 673-681 (06:33:16 to 06:33:18) – Clark runs straight toward Crim (in the dark shirt), who has just entered the room through the door near the end of the desk and in close proximity to the water fountain and the mop and bucket, and, as Clark is about within arm's length of Crim, Rivers runs from behind and grabs Clark around the shoulders (Frames 677-78), pushing him away from Crim and taking Clark down; Wilmoth is approaching from the end of the couches near the desk; Franklin is standing at the opposite end of the couches (*See also* Report at 464)

---

[18] According to Clark, he punches the door twice with closed fists. (Clark Dep. at 231.)

The actual moment of alleged "excessive" force occurred within a span of about 2 seconds. When Rivers took Clark down, they both slammed into the wall and Clark "sustained a comminuted fracture of the distal third of the humerus of the right arm." (Bradley Decl. ¶ 4.) Dr. Bradley attests that a comminuted fracture "usually occurs due to direct impact of the upper arm, such as a collision with another player during contact sports, falling on the shoulder, or as the result of being in a motor vehicle accident." (Bradley Decl. ¶5; *see also* Clark Dep. at 287 (Rivers "hit me like a football player" in the upper body).) Dr. Bradley declares that "the initial break to Youth Clark's right arm occurred when he fell into the wall and onto the floor[.]" (*Id.* ¶ 6.)

Clark argues that there are genuine issues of material fact as to whether the force used was excessive. (Opp'n at 699.) He asserts that the use of force was clearly unnecessary and unreasonable because he was unarmed and had no intention of obtaining a weapon or causing any harm. (*Id.* at 701.) But, although the security footage certainly shows Rivers using force to stop Clark's forward movement, there is nothing to suggest *excessive* force, that is, there is nothing to suggest that any guard, including Rivers, "maliciously and sadistically" broke Clark's arm. Under the circumstances, this was an accidental injury.

Clark further claims that, "[e]ven after [he] was thrown to the floor and he screamed out in pain to the guards, telling them he was injured[,] they continued to use unnecessary force causing serious and painful injury." (*Id.*) He asserts that the force used by Rivers and Wilmoth, who "knew that [he] was injured" and "heard [him] saying his arm was broken[,]" (Opp'n at 702), far exceeded the standard articulated in *Norton v. Still*, 526 F. App'x 509 (6th Cir. 2013).[19]

---

[19] In *Norton*, an officer *knowingly* broke in three places the arm of a 5 ft.-4 in., 130-lb., 58-year-old, disabled woman (who utilized a motorized scooter) while booking her into custody for inability to immediately pay a $150 contempt fine for failure to appear for jury selection in a misdemeanor trespass case. Despite plaintiff's assertion that the instant case "mirrors" *Norton*, its applicability is highly questionable, not only due to significant factual differences, but also since *Norton* involved force that is to be analyzed under the Fourth Amendment. Such analysis involves

11

Clark's assertion that he told the guards he was injured *while* they were handcuffing him (implying that it was excessive force to continue) is not borne out by the video taken by YS Arrington with a hand-held camera.[20] The following roughly describes the contents of the video footage,[21] according to the minutes/seconds counter:

- 00:01 to 00:08 – Clark is lying face down while being handcuffed; he is repeatedly screaming "please," but never states that he is injured

- 00:16 to 00:21 – A guard tells him to "roll over" and to "sit up"

- 00:27 to 00:28 – While assisting him to stand up, a guard grabs him by his upper right arm; Clark groans and his facial expression could be interpreted as one of pain, but he does not scream or affirmatively indicate that his arm is injured

- 00:29 to 00:31 – As he stands up, Clark glances toward his right arm, but still says nothing

- 00:33 to 00:57 – Almost immediately after getting to his feet with the assistance of the guards, Clark slumps back down to the floor, which the guards permit him to do as one of them says "Hold on, hold on;" as Clark lies on his right side, a guard is heard saying, "Call medical." (00:57)

- 00:59 to 1:08 – Clark rolls *himself* over, *on his right arm*, and then rolls back to a position on his stomach; he is breathing heavily, but he is not screaming (coughing and throat-clearing can also be heard, but the source does not appear to be Clark)

---

determining whether actions are "objectively reasonable," without regard to subjective intent. Under that analysis, the Court would need to "balance 'the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake.'" *Norton*, 526 F. App'x at 512 (quoting *Graham v. Connor*, 490 U.S. 386, 396, 109 S. Ct. 1865, 104 L. Ed. 2d 443 (1989)). The Eighth Amendment analysis, with both objective and subjective components, applies a "less protective" standard. *Graham*, 490 U.S. at 398.

[20] The video evidence is further supported by Clark's own statement to the ODYS on January 22, 2013, after his attorney authorized his speaking to the investigator. He reportedly told the investigator that, after he was handcuffed and brought to his feet by the officers, "he felt dizzy and fell down on to the ground." He told the investigator that "this was the first time that he could not feel his right arm from his elbow area on up and knew that his right arm was broken." He stated that "Wilson saw that he was not getting up off the ground after he fell and told one of the YS (he does not remember who) to remove his handcuffs and they did." After that, "the 2 nurses came and started checking out his right arm." (Report at 449.)

[21] It is impossible to determine which guards are acting or speaking in the video because only their feet are visible for most of the footage. At one point, Rivers is referred to specifically, but otherwise, no one is identifiable.

12

- 01:08 to 1:25 – As Clark lies on his stomach for several seconds, a guard asks him if he can roll over on his back; he does not appear to respond; the guard tells him he will have the staff roll him over on his back, so he can be sitting up when medical arrives

- 01:34 to 01:53 – Rivers (referred to as "Riv" in the video) reaches down and takes hold of Clark's right arm, attempting to roll him over; Clark cries out in what can be interpreted as pain, but is eventually brought to a sitting position

- 01:54 to 02:36 – Clark quickly slumps back over, this time on his left side, where he remains for several seconds, completely silent

- 02:37 to 02:53 – Clark begins to move as if he is attempting to sit up and a guard reaches to assist; Clark screams as the guard touches his right shoulder; a guard says: "Sit up; you're the one causing the pain on yourself; sit up."

- 02:54 to 03:15 – Clark sits and he is informed that medical personnel are coming; he remains seated on the floor, and appears to be in pain

- 03:16 to 03:45 – A command is heard directing guards to remove Clark's handcuffs and Clark is told that, if he complies with staff, the handcuffs will be put "around the front."

- 03:46 to 03:54 – With the cuffs off, Clark tries to move his right arm and screams in pain; a guard asks if medical is coming

- 03:55 to 03:58 – A guard is heard saying, "Okay, there's something wrong with that arm."

- 03: 59 to 04:01 – Clark continues to scream in pain and a guard says, "Don't touch that arm;" the handcuffs remain off from that point on

- 04:02 to 04:15 – Clark is asked repeatedly if he can stand up, but remains on the floor as medical personnel arrive to assist

- 04:16 to 04:40 – Guards help Clark get up from the floor and into a chair, while he screams loudly and his right arm hangs limp; a guard is heard saying again "Don't touch that arm." (04:18)

- 04:40 to 04:41 – As Clark sits in the chair, with medical personnel nearby and ready to examine him, he screams, for the first time, "It's broke."

- The remainder of the video shows the medical personnel assisting Clark, indicating that he will need to "go out" for treatment (05:31); there are visible abrasions on the left side of Clark's face and on his left shoulder

Throughout this video recording of the handcuffing, there is not a single instance where a guard raises his voice in anger or frustration at Clark, that is, there is no evidence to suggest any negative animus or aggressiveness toward Clark, nor any action taken "maliciously and sadistically for the very purpose of causing harm," *Whitley*, 475 U.S. at 320-21, even in the stress of that moment. Notably, at all times both during and after the handcuffing of Clark, despite the fact that *he* had been acting aggressively, and further despite the fact that these events escalated within seconds, all the guards exhibited a calm and controlled demeanor, speaking quietly to Clark as they give him directives.

Viewing the video in the light most favorable to Clark, a reasonable jury could find that his screaming alone was an indication of pain, suggesting injury. But there is nothing in this video to suggest that the guards gratuitously inflicted pain on Clark *after* taking him down and *while* handcuffing him, even if they may have exhibited bad judgment in continuing to move him despite his undefined screams. *See Jackson v. Jackson*, No. 96-5118, 1997 WL 225659, at *1 (6th Cir. May 1, 1997) ("[n]egligence and deliberate indifference are irrelevant to a claim of excessive force in violation of the Eighth Amendment[,] [which] requires proof that force was applied maliciously and sadistically to cause harm.") (citing *Hudson*, *supra*). As recorded on the videotape, it was not until nearly four minutes into the video filmed with the hand-held camera that a guard appears to figure out that "there's something wrong with [Clark's] arm" (Video at 03:55) and, realizing the possible source of Clark's pain, directs the others not to touch the arm.[22]

---

[22] In his opposition brief, Clark makes much of the fact that the initial investigation concluded that there was an "inappropriate use of force" by Rivers. (*See* Report at 465.) But, this conclusion was ultimately rejected by Edward Glennon, the ODYS official in charge of facility safety and security, who concluded that "the video evidence" and witness testimony showed Clark as the aggressor and that Rivers had "lunged at him to remove the danger Clark posed to responding staff [i.e., YS Crim]." (Glennon Aff. ¶ 4, Doc. No. 41-1.) Glennon "overruled [the

14

Clark asserts it was excessive force for Wilmoth to twist his arm behind his back during handcuffing, the movement that, according to Dr. Bradley, likely caused the displacement of the initial fracture that had occurred when Clark and Rivers slammed into the wall. Dr. Bradley actually attested that "the combination of him [Clark] being restrained and resisting would result in the fracture being displaced[,]" and that it would "not take much motion to cause displacement and pain." (Bradley Decl. ¶¶ 6, 8.) Dr. Bradley also noted that "[b]y staff having Youth Clark's arm against his lower/middle part of his back in an 'L' shape as is often seen in the handcuffing technique, the combination of motion of the arm upwards and Youth Clark's twisting his body while resisting would displace an already broken bone." (*Id.* ¶ 8.)[23]

Without knowledge that Clark was injured, defendants' application of any force during the handcuffing was merely "a prison security measure [ ] undertaken to resolve a disturbance[.]" *Whitley*, 475 U.S. at 320. There is no evidence suggesting that the "force was applied … maliciously and sadistically for the very purpose of causing harm." *Id.* at 320-21 (further quotation marks and citation omitted).

Plaintiff's argument relating to the necessity of the handcuffing is more in the nature of "deliberate indifference" which, according to *Whitley*, is not the correct standard in this context. "It is obduracy and wantonness, not inadvertence or error in good faith, that characterizes the conduct prohibited[.]" *Whitley*, 475 U.S. at 319. When corrections officers are using force to restore order, "a deliberate indifference standard does not adequately capture the importance of []

---

investigator's] finding of inappropriate force." (*Id.* ¶ 5.) But, even if that finding had survived Glennon's review, importantly, to prove a constitutional violation, plaintiff must prove "excessive" force, as defined by case law, not "inappropriate" force.

[23] This testimony is unrefuted. Clark argues that he need not produce an expert because the average juror can understand broken arms. (Opp'n at 703.) As a general principle that may be true; but, in this case, the broken arm was more complicated, such that an average juror would benefit from a medical doctor's explanation of how the injury would typically have occurred and what extenuating factors might have contributed to its severity.

15

competing obligations, or convey the appropriate hesitancy to critique in hindsight decisions necessarily made in haste, under pressure, and frequently without the luxury of a second chance." *Id*. at 320.

This case is quite similar to *Booher ex rel T.W. v. Montavon*, 555 F. App'x 479 (6th Cir. 2014), where plaintiff brought a claim on behalf of her minor son alleging that his rights were violated during an altercation with staff while he was in ODYS custody. Specifically, the complaint alleged that an officer "used excessive force by violently twisting Webster's [the youth's] hand and fracturing his left wrist[.]" *Id.* at 481. The Sixth Circuit explained:

> When [ ] the parties tell conflicting stories, "one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380, 127 S. Ct. 1769, 167 L. Ed. 2d 686 (2007). This applies not only when there is videotape evidence, but whenever the nonmoving party's version is "so blatantly contradicted by objective evidence in the record that it fails to create a genuine issue of material fact for trial." *Coble* [v. City of White House, Tenn., 634 F.3d 865, 869 (6th Cir. 2011)]. Here, without making a credibility determination, the district court found that Webster's version of Bowling's actions was blatantly contradicted by the uncontroverted medical evidence showing that "the type of fracture [Webster] suffered resulted from an impact consistent with a fall, and not by being twisted." We agree. Because Webster's version rested on a showing that Bowling twisted Webster's hand with sufficient force to cause the fracture, a fact that was blatantly contradicted by the only medical evidence that had been presented[,] Webster's testimony in that regard was insufficient to create a genuine issue of material fact for trial. *See Griffin*, 604 F.3d at 956.

*Id.* at 484.

No matter how much plaintiff attempts to turn this incident into an "assault" by defendants, no matter how much he "vigorously contests [d]efendants' assertions that the force used by [d]efendants Rivers and Wilmoth was reasonable[,]" (Opp'n at 697), the record evidence, even viewed in the light most favorable to him, does not support his view. To the contrary, the video and audio that has been made available to the Court, which plaintiff himself

admits is the "best evidence" (*id*. at 696), establishes that "no reasonable juror could believe [plaintiff's story]," and that, as a matter of law, this Court "should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott*, 550 U.S. at 380. Rather, as clearly depicted by the audio and video footage, the ODYS guards were acting to resolve a penological security situation that Clark had initiated and, further, that they exerted only the force necessary to bring the situation under control.

Here, even if the Court takes as true Clark's assertion that Rivers "tackled" him, the security footage shows that Clark (admittedly upset) tore off his shirt, strode assertively across the room, and slammed his fist into the wall. It shows that officers, particularly Franklin, tried to talk him down, but that he "squared off" with Rivers, took off running, jumped over two couches, and bounded toward Crim, who was entering the room in an area in close proximity to a bucket and mop. Rivers followed, running after Clark, and "tackled" him or "grabbed" him, causing both of them to fall against the wall, resulting in Clark's broken arm. While Clark continued to struggle, officers proceeded to handcuff him, an action whose twisting, when combined with Clark's resisting, ultimately exacerbated the break – a break that there is no evidence to suggest defendants knew existed at the time. When it became evident that Clark seemed injured, and that the injury was possibly to his arm, the handcuffs were removed. One of the guards instructed the other guards not to touch Clark's arm, and he was assisted to a chair, at which time, medical personnel, who had already been called, tended to him. *See also Eguabor v. Hunter*, No. 3:08-0248, 2009 WL 1043924, at *6 (M.D. Tenn. April 17, 2009) (granting summary judgment to defendant, concluding that "the use of some physical force" was justified, even though it resulted in plaintiff's broken leg, where "plaintiff created a disturbance [], was

visibly agitated and angry, ignored verbal orders, cursed at correctional officers, threatened another inmate, and threw a trash can across the housing pod.").

Unfortunate as the result of this incident was for Clark, he fails to meet his burden of showing excessive force within the meaning of the Eighth Amendment. Defendants are entitled to summary judgment.[24]

### III. CONCLUSION

For the reasons set forth herein, defendants' motion for summary judgment (Doc. No. 36) is granted.

**IT IS SO ORDERED**.

Dated: December 30, 2016

                                      **HONORABLE SARA LIOI**
                                      **UNITED STATES DISTRICT JUDGE**

---

[24] Defendants also raise a qualified immunity argument (MSJ at 377) which, in view of the decision on the merits, need not be addressed.